CINCINNATI INSURANCE COMPANY, Appellant and Cross–Appellee,

v.

HAACK et al., Appellees; Fugate, Appellee and Cross–Appellant.

[Cite as *Cincinnati Ins. Co. v. Haack* (1997), 125 Ohio App.3d 183.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 16375.

Decided Dec. 5, 1997.

*Stephen C. Findley,* for appellant and cross-appellee.

*James S. Armstrong,* for appellee and cross-appellant Bradley Fugate.

*Thomas M. Green,* for appellee Continental National Indemnity Company.

---

FREDERICK N. YOUNG, Presiding Judge.

This matter concerns the battle between two insurers, the insurer of an owner-lessor of a truck and the insurer of the motor carrier company-lessee of the same truck, over who was responsible for the truck at the time it was involved in an accident. The issue of financial responsibility as between the leased truck and the other truck involved in the accident is still in dispute.

## I

This case arose out of a motor vehicle accident between a truck owned by Bradley Fugate and a truck owned by Marcotte–Richter Landscaping, Inc. ("Marcotte"). Fugate's truck was leased to Roy Hageman & Sons ("Hageman") motor carrier company and was driven by Fugate's employee, David Haack. Fugate insured his truck through Continental National Indemnity ("Continental"). Hageman and Marcotte were insured through Cincinnati Insurance Company ("Cincinnati Insurance").

In 1989, Fugate desired to buy a 1984 International dump truck owned by Woody's Trucking. Fugate did not have the money, however. Therefore, Fugate decided to approach the owner of Hageman and ask him if his company would purchase the vehicle and allow to him purchase the vehicle from Hageman

through an installment payment plan. Fugate proposed paying for the truck by leasing the vehicle and a driver to Hageman and by Hageman deducting from its lease payments the amount of Fugate's truck payments.

Hageman agreed to this plan, and on April 18, 1989, Hageman entered into a lease agreement with Fugate. Under the terms of the agreement, Fugate leased his 1984 International dump truck as well as a driver to Hageman. Fugate kept his truck at Hageman's company lot. Hageman permitted its leased trucks to be kept on its lot without charge. About fifteen of the fifty-five trucks that Hageman leased parked on Hageman's company lot.

On June 29, 1995, Hageman dispatched twelve of its leased trucks, including Fugate's truck, to the Fairfield Commons Mall to haul away a load of dirt for the Miller Brothers Construction Company. Hageman had been dispatching its leased vehicles and drivers to that site to haul away dirt during the preceding five weeks. Fugate asked his employee, Haack, to drive the truck to the mall. Haack, who had previously driven the truck to the job at the Fairfield Commons mall, agreed to perform the job.

Haack drove to Hageman's lot to retrieve Fugate's truck. When Haack arrived at Hageman's lot, he parked his automobile there, picked up the truck, and headed toward the mall. When Haack arrived at the mall, none of the Miller Brothers' employees were present at the site, and it was raining. Haack and the other drivers waited for about an hour at the job site until Hageman's dispatcher informed the drivers that the Miller Brothers had canceled the job and told the drivers to return to Hageman.

Haack left the job site with an empty load and headed back to Hageman. On the way back, Haack claims that while he was driving in the left-hand lane of a four-lane road, a pick-up truck owned by Marcotte Landscaping tried to make a left-hand turn in front of him. Unable to avoid a collision, Haack struck Marcotte's pick-up truck on its left side. The driver of Marcotte's pick-up truck was injured and both of the trucks incurred a significant amount of damage. Hageman's insignia as well as its Public Utilities Commission of Ohio placard were in the window of Fugate's truck at the time of the accident.

The police initially cited Haack for making an illegal lane change within a hundred feet of an intersection. However, Haack contested the citation, and the court ultimately dismissed it. Marcotte filed a claim with its insurance company, Cincinnati Insurance. Cincinnati Insurance paid Marcotte's claim and, in exchange, Cincinnati Insurance became subrogated to Marcotte's claims against Haack and Fugate for the accident.

Cincinnati Insurance then filed a complaint against Haack and Fugate to seek recovery for the payments it made to Marcotte. On March 19, 1996, Cincinnati

Insurance, as the insurer for Hageman, moved for leave to intervene as a second plaintiff in the subrogation action. In its intervenor's complaint, Cincinnati Insurance sought declaratory judgment as to whether it had a duty to defend and indemnify Fugate and/or Haack under Hageman's insurance policy. Fugate's insurance carrier, Continental, was also made a party to the suit. Additionally, Marcotte and the driver of its truck were made parties to the action.

Essentially, the contest in this action was over which insurance carrier bears responsibility for Fugate's truck: Cincinnati Insurance, the insurer of the lessee of the truck (Hageman), or Continental, the insurer of the owner of the truck (Fugate). The issue of whether Fugate's truck or Marcotte's truck was responsible for the accident has been postponed until the dispute between Fugate's insurer and Hageman's insurer as to which insurer covered Fugate's truck at the time of the accident is conclusively decided.

On August 28, 1996, after discovery, Continental filed a motion for summary judgment. Cincinnati Insurance filed its own motion for summary judgment and a memorandum in opposition to Continental's motion for summary judgment on September 9, 1996. Fugate filed a motion for summary judgment on that date as well. Four days later, on September 13, 1996, Haack also filed a motion for summary judgment. On January 9, 1997, the trial court issued a decision and entry denying Cincinnati Insurance's and Fugate's motions for summary judgment. Additionally, the trial court granted Continental's motion for summary judgment, and granted Haack partial summary judgment.

The trial court determined that Cincinnati Insurance was responsible for the leased truck. The trial court reached this conclusion by using a different analysis from the one outlined by this court in our prior precedent, *Ohio Cas. Ins. Co. v. United S. Assur. Co.* (1993), 85 Ohio App.3d 529, 620 N.E.2d 163. In *Ohio Cas.*, we held that the insurer of the lessee is statutorily presumed to bear responsibility for the leased motor vehicle when the lessee's placard is adorning the window of the vehicle and a valid lease is in effect. The trial court declined to follow our precedent because after our decision the legislature passed a statute that some argue has legislatively overruled the Ohio Supreme Court case upon which our decision was based.

Rather than following our precedent and presuming Cincinnati Insurance's responsibility, the trial court considered whether Cincinnati's Insurance's policy covered the accident. In particular, the court considered whether the policy's exclusion for liability assumed under a lease agreement was implicated. Fugate's and Hageman's lease agreement provided that Fugate was to assume responsibility for insurance coverage during periods when the leased truck was not being used "in the service of" Hageman. Cincinnati Insurance argued that its exclusion for liability assumed under an agreement was implicated because, according to

Cincinnati Insurance, the truck was not being used "in the service of Hageman" at the time of the accident.

To decide whether this exclusion applied, the court considered cases which analyzed the meaning of the phrase "in the service of" under insurance policies as well as the common-law meaning of the phrase. The trial court determined that, under those sources, one is acting "in the service of" the lessee on a return trip to the lessee's dispatch after performing a job for the lessee. Because the court determined that Fugate's truck was being used "in the service of" Hageman, the court determined that Fugate's assumption of liability for periods when the vehicle is "not being used in the service of" Hageman did not apply. Correspondingly, the court determined that Cincinnati Insurance's exclusion for liability assumed under the lease agreement was not invoked. Consequently, the court determined that Cincinnati Insurance, under Hageman's policy, was responsible for Fugate's truck at the time of the accident. Cincinnati Insurance has now filed this timely appeal of that decision, and Fugate has cross-appealed the denial of his summary judgment motion. The trial court made this appeal possible by entering a Civ.R. 54(B) determination that there was no just reason for delay.

## II

### Summary Judgment Standard

■ Summary judgment is appropriate when there is (1) no genuine issue of material fact, (2) the movant is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion is made. Civ.R. 56(C); *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. All competing inferences and evidence must be construed in favor of the nonmoving party in deciding a motion for summary judgment. Civ.R. 56(E); *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202, 216–217.

■ The party moving for summary judgment bears the initial burden. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264 (Justice Pfeifer concurring in judgment only, but agreeing with the majority opinion's limit of paragraph three of the syllabus in *Wing v. Anchor Media, Ltd. of Texas* [1991], 59 Ohio St.3d 108, 570 N.E.2d 1095). To satisfy this burden, moving party need only inform the trial court of the basis of its motion and identify portions of the record which demonstrate the absence of a genuine issue of material fact as to the essential elements of the nonmoving party's claims. *Id.* at 293, 662 N.E.2d at 273–274. Although it is not necessary for the movant to negate or disprove the nonmoving party's claims, the movant cannot discharge its initial burden by

simply making a conclusory assertion that the nonmoving party has no evidence to support its claims. Instead, the movant must point to portions of the record that affirmatively demonstrate the opponent's lack of evidence to support its claims.

Once the moving party has satisfied its burden, the nonmoving party has the reciprocal burden of setting forth specific facts illustrating that there is a genuine issue for trial. Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the nonmoving party must go beyond the pleadings and—by affidavits, depositions, answers to interrogatories, and admissions—designate specific facts showing that there is a genuine issue for trial. If, after the nonmoving party has had adequate time for discovery, the nonmoving party is still unable to raise a genuine issue of material fact, the action should be disposed of under summary judgment. With this standard in mind, this court will assess the merits of Cincinnati Insurance's assigned error.

Before we address Cincinnati Insurance's argument, however, we will first give the reader a review of the law regarding motor carrier liability. We find that such a review is necessary because the parties cite a myriad of authorities on motor carrier liability, including common law, federal and state regulations, and insurance law, some of which are wholly inapplicable. Additionally, the legal principles pronounced under those authorities are confounded by the parties and are in general easily confused. Thus, we find that an explanation as to the application of those principles is helpful to an understanding of this case.

## A

### Motor Carrier Liability

Motor carrier liability was determined under common law by means of a two-part test. Courts would use the two-part test to determine whether the lessee-motor carrier or the owner-lessor was responsible for a leased motor vehicle and driver involved in an accident. Annotation, Liability Under Respondeat Superior Doctrine for Acts of Operator Furnished with Leased Machine or Motor Vehicle (1951), 17 A.L.R.2d 1388, 1396–1415. Under the first part of the test, courts would determine whether the lessee or owner of the motor vehicle was the master of the truck and driver at the time of the accident. To determine this, courts would visit the common-law test for a master-servant relationship. *Babbitt v. Say* (1929), 120 Ohio St. 177, 188, 165 N.E. 721, 724.

The key consideration in the common-law master-servant test is who "controlled" the individual. *Id.* at 189–190, 165 N.E. at 724–725. In the context of leased motor carriers, courts would look at several factors in determining who had "control" over the truck and driver, including, who controlled the routes, and

who furnished the gasoline, oil, and service for the truck. *Id.*[1] Relying on these factors, the Ohio Supreme Court determined that a lessee is not the master of the truck and driver when the lessee merely directs the operation of a leased vehicle as to where and when it should be driven. *Id.* at 192, 165 N.E. at 725–726. On the contrary, the court held that where the owner hires out a truck and driver at a stipulated price per hour, furnishes gasoline, oil, and service, and selects, pays, and fires the driver, the owner and not the lessee is found to "control" the truck and driver. *Id.* at 190, 165 N.E. at 725. Thus, the court declared that, under those circumstances, the owner is the master of the truck and driver. *Id.* at 193, 165 N.E. at 726.

Once courts determined who was the master of the truck and driver, courts would then consider the second half of the common-law test, which is whether the master was liable for the servant's negligence. *Id.* at 196, 165 N.E. at 726–727. To determine whether the master was responsible for the servant's negligence, courts would visit the doctrine of *respondeat superior.* *Id.* The doctrine of *respondeat superior* provides that the master is responsible for damages resulting from the negligence of his servant when, at the time of the accident, the servant was acting within the scope and course of its employment with the master or in the business of the master. *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 587 N.E.2d 825. Applying this test to the context of leased motor vehicles, courts would ask whether the truck and driver were being used "in the service of" the master at the time of the accident. If the vehicle was being operated "in the service of" the master at the time of the accident, then courts would impose liability for the negligent operation of the vehicle on the master.

Apparently, lease arrangements became very attractive to motor carrier companies. Courts have ascertained that these lease arrangements became attractive to carriers for two main reasons. *E.g., Simpkins v. Protective Ins. Co.* (1981), 94 Ill.App.3d 951, 50 Ill.Dec. 449, 419 N.E.2d 557; *Indiana Refrigerator Lines, Inc. v. Dalton* (C.A.6, 1975), 516 F.2d 795, 796. First, motor carrier companies used leased arrangements to avoid liability for accidents that occurred while vehicles were being used in their business. See *Simpkins, supra.* Motor carriers were able to avoid liability by taking advantage of the common-law master-servant test. Motor carriers would lease their vehicles from independent contractors, who were usually independent individuals who owned their own vehicles. Motor carriers would then structure their lease agreements so that the drivers and the trucks could not be found to be under the "control" of the lessee motor carrier. Thus, the responsibility for accidents would fall on the single, independent truck-owner rather than the deeper pockets of the motor carrier

---

1. The truck and driver are often leased as a unit.

company. As a result, motor carrier companies, who were primarily in the business of hauling loads for clients by truck, were able to escape liability for virtually all motor vehicle accidents occurring in the motor carrier's business.

The second main purpose of these lease agreements was to avoid compliance with federal and state regulations of motor vehicles. *Id.* Federal motor carrier regulations were promulgated by the (now defunct) Interstate Commerce Commission ("I.C.C."), which governed motor carriers in interstate commerce, whereas state motor carrier regulations are promulgated by the Ohio Public Utilities Commission ("P.U.C.O."), which governs motor carriers in intrastate commerce. These federal and state regulations impose safety requirements with regard to the operation and maintenance of motor vehicles in commerce. Furthermore, the federal and state regulations prescribe rules with regard to motor carriers' drivers, including the qualifications of drivers and the drivers' hours of work.

Motor carriers were able to avoid compliance with these regulations by leasing motor vehicles from truck owners who were not regulated by the I.C.C. or P.U.C.O. and by structuring the lease arrangements so that the driver and truck could not be found to be under the "control" of the lessee under the master-servant test. This meant in many cases that lessee motor carriers were able to avoid safety standards imposed by the I.C.C. or the P.U.C.O. and the attendant necessary but inevitably more costly and cumbersome compliance with those regulations. Furthermore, the lessee could escape liability for accidents resulting from the failure to comply with those regulations—such as accidents resulting from the failure to properly maintain the vehicle—by demonstrating that, under common law, the driver and the truck were not under its "control."

There were early attempts, although with only modest success, under common law to address these problems. Annotation, Liability of Motor Freight Carrier Possessing Certificate from Interstate Commerce Commission and Employing Noncertified Independent Contractor under "One-way" Lease of Latter's Vehicle for Negligence of Latter's Employee on Return Trip (1951), 16 A.L.R.2d 960. Courts attempted to prevent lessee motor carrier companies from escaping liability through two exceptions to the general rule that an employer is not liable for the torts of an independent contractor. *Id.* The first exception that courts would use is that an employer cannot escape liability for tortious injuries to others through the creation of an independent contractor relationship if the work to be performed is inherently dangerous to others.

Courts using this exception declared that commercial trucking is an inherently dangerous activity involving an unreasonable risk of harm to others. *E.g., Hodges v. Johnson* (D.C.Va.1943), 52 F.Supp. 488. Courts found commercial trucking to be inherently dangerous because it is "a matter of common knowledge that the transportation of freight upon the highways, usually by means of huge

trucks and trailers, is fraught with great danger to the traveling public," so as to call for strict. and detailed regulatory laws by both the states and the federal government in order to protect the traveling public. *Id.* at 490. Applying this reasoning, courts held that as a matter of public policy motor carriers holding I.C.C. permits should be held responsible for a leased motor vehicle whenever the motor carrier contracts with an independent contractor. Courts found that otherwise "the public might be entirely deprived of the safeguards * * * required by the Interstate Commerce Commission, by means of certificate holders evading their responsibility by the employment of irresponsible persons as independent contractors." *Id.*

The second exception to the general rule of no liability that courts would apply is that where an operation may only be carried on by permission given by a public authority, an independent contractor relationship cannot be created for the purpose of escaping liability for harm to others that would otherwise attach.[2]

"There [were] * * * many cases which announce[d] and * * * [applied] the latter exception in considering the liability of commercial motor vehicles in connection with operation under permission from a public authority, holding that if a general and unlimited relationship of employer and independent contractor is established and subsists at the time of negligent injury to another the employer is not excused by the fact that he has operated through an independent contractor whose employee was negligent." Annotation, 16 A.L.R.2d at 961.

Relying on this exception, the court in *Hodges, supra,* found that a truck was still under the responsibility of the lessee on a return trip with an empty load. "[W]here a public authority grants to an individual or corporation authority to engage in certain activities involving danger to the public, which right is denied to the general public, the duty to safeguard the public while performing such franchise activities is legally nondelegable, and the franchise holder is therefore responsible for the conduct of those whom it permits to act under its franchise, even though such persons be independent contractors * * * [and] if under the facts the franchise holder was to be held responsible for the operation of the truck on the mission and under the franchise, it would be 'absurd to say that this responsibility should attach while the truck is proceeding on its journey loaded, and should not attach on the return journey while empty,' because both trips were 'necessary parts of the same trip, and the whole trip was undertaken, and was being made, under the authority of [the motor carrier's] franchise.'" Annotation, 16 A.L.R.2d at 962–963, quoting *Hodges,* 52 F.Supp. at 492.

---

2. Often courts would use a mixture of the first and second exceptions to impose liability on a lessee.

In addition to the common-law attempts to prevent motor carriers from evading liability and compliance with regulations, the I.C.C. attempted to rectify these problems by expanding its regulation of motor carriers to include the lease practices of motor carriers in interstate commerce. More specifically, the I.C.C. tried to prohibit motor carriers from escaping liability for the negligence of leased drivers and trucks by statutorily making the lessee the master of the leased driver and truck and by statutorily placing the leased driver and truck under the possession and control of the lessee. One of the Interstate Commerce Commission's earliest formulations of these statutorily created relationships was promulgated in 1936 as Administrative Rule No. 4, which provided as follows:

" 'Question: Under what circumstances may a carrier add to its equipment by leasing a vehicle and obtaining the service of its owner-driver?

" 'Answer: The lease or other arrangement by which the equipment of an authorized operator is augmented, must be of such a character that the possession and control of the vehicle is, for the period of the lease, entirely vested in the authorized operator in such way as to be good against all the world, including the lessor; that the operation thereof must be conducted under the supervision and control of such carrier; and that the vehicle must be operated by persons who are employees of the authorized operator, that is to say, who stand in the relation of servant to him as master.' " *Behner v. Indus. Comm.* (1951), 154 Ohio St. 433, 438, 43 O.O. 360, 363, 96 N.E.2d 403, 406, quoting Adm. Rule No. 4. Adm. Rule No. 4 was rewritten in 1939 to provide:

" 'The lease or other arrangement under which the carrier utilizes in its operations a vehicle which it does not own, whether or not including the services of an owner-driver or his representative, must be of such a character that the carrier will have the right to direct and control the operation of the vehicle at all times and be fully responsible therefor in all respects under all applicable provisions of law governing the duties and obligations of the carrier to the shipper and to the public generally.' " *Id.,* quoting Revised Adm. Rule No. 4.

The purpose of the revised Adm. Rule No. 4 was thought to be the same as the former rule, that is, to statutorily create a master-servant relationship between the lessee and the leased driver and vehicle. This statutory master-servant relationship was used to prevent lessee motor carriers from avoiding liability for accidents as well as compliance with I.C.C. regulations by leasing motor vehicles and drivers from nonregulated carriers. Courts gave voice to this purpose as follows:

"The purpose of the adoption of [Administrative Rule No. 4] was to make the interstate carrier responsible to the public for wrongs done or injuries inflicted by the carrier or those acting for it throughout the entire course of any transportation project undertaken by the carrier.

"* * *

" 'Apparently the Legislature intended to protect the public against loss from negligence on the part of anyone using the highway in the business of transportation by truck. Therefore the trial courts were correct in charging the juries that these defendants could not escape liability by delegating their duties to independent contractors.' " *Behner*, 154 Ohio St. at 439–440, 43 O.O. at 363–364, 96 N.E.2d at 406–407, quoting *Duncan v. Evans* (1938), 134 Ohio St. 486, 487, 13 O.O. 55, 56, 17 N.E.2d 913, 914.

The Ohio Supreme Court first interpreted and applied the revised Adm. Rule No. 4 in *Thornberry v. Oyler* (1955), 164 Ohio St. 395, 58 O.O. 189, 131 N.E.2d 383. In *Thornberry*, the court determined that Adm. Rule No. 4 statutorily created a master-servant relationship between lessees and the leased vehicle and driver when the motor vehicle is being operated under the lessee's I.C.C. and P.U.C.O. permits. The court discerned that Adm. Rule No. 4 statutorily created a master-servant relationship because the rule provided that where the carrier uses a vehicle in its operations that it did not own, the lease arrangement had to include the right to "direct and control" the operations of the driver and the lease agreement had to place the "full responsibility" for the operation of the vehicle on the lessee.

The court further found that when a master-servant relationship exists between the lessee and the driver, the lessee is responsible for the negligence of the driver when, as with common-law master-servant relationships, the doctrine of *respondeat superior* is satisfied. The doctrine of *respondeat superior* provides that a lessee is liable for the negligence of its driver when the driver is found to have been acting in the scope and course of the motor carrier's business. The court determined that, under the doctrine of *respondeat superior*, where the servant-driver, going on a mission of his own, makes a clear and complete deviation and departure from the scope of his master's business, the master is not responsible for any acts of the servant occurring during the period of the deviation.

Turning to the case before it, the court in *Thornberry* applied the doctrine of *respondeat superior* to determine whether, at the time of the accident, the driver was acting in the course and scope of his employment with the lessee. The court found that the driver was not acting in the scope and course of his employment with the lessee because the driver deviated from the scope of his employment by disregarding the instructions of his employer to return the truck. Rather than returning the truck, the driver went on a mission of his own to haul a load for another motor carrier. As a consequence of these findings, the court determined that the lessee in that case could not be held liable for the driver's negligence.

After *Thornberry, supra,* Adm. Rule No. 4 was replaced by Section 11107, Title 49, U.S.Code, and Section 1057.12, Title 49, C.F.R., promulgated thereunder, which outlines the requirements of motor carrier leases. Paragraph (c) of Section 1057.12 provides:

*"Exclusive possession and responsibilities.* (1) The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and the use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease."

Paragraph (j) of Section 1057.12 discusses insurance coverage; it provides:

*"Insurance* (1) The lease shall clearly specify the legal obligation of the authorized carrier to maintain insurance coverage for the protection of the public pursuant to Commission regulations under 49 U.S.C. 10927. The lease shall further specify who is responsible for providing any other insurance coverage for the operation of the leased equipment, such as bobtail insurance."

The I.C.C. regulations further require that all I.C.C.-certified carriers maintain insurance or other form of surety "conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance, or use of motor vehicles" under the carriers' permits. Section 1043.1(a), Title 49, C.F.R.

Section 1507.12 differs from the former Adm. Rule No. 4 in that the new provisions provide that the lessee shall have "exclusive possession and control" of the vehicle and "assume complete responsibility" for the operation of the vehicle, while Rule No. 4 only gave the lessee the right to "direct and control" the operation of the leased motor vehicle. Section 1507.12(c)(1), Title 49, C.F.R. As with Adm. Rule No. 4, courts have unanimously found that Section 1507.12 creates what has been termed a "statutory employment" relationship between the lessee and the leased driver and truck. Courts found that this presumption of a master-servant relationship arises when the leased motor vehicle is displaying the insignia and I.C.C. placard of the lessee.

Courts are split, however, as to whether the new provisions go further than Adm. Rule No. 4 to create a statutory presumption of the satisfaction of the doctrine of *respondeat superior.* As we previously explained, although Adm. Rule No. 4 created a presumption of the satisfaction of the test for a master-servant relationship, it did not create a presumption of the doctrine of *respondeat superior.* Thus, under Rule No. 4, courts, like the Supreme Court in *Thornberry, supra,* would still consider whether the common-law doctrine of *respondeat superior* was satisfied to determine whether the lessee could be held liable for the leased driver and truck. With the new I.C.C. provisions, however, courts have

split as to whether courts need to visit the common-law test for *respondeat superior* to determine whether the lessee is liable for the leased driver and truck or whether courts may now presume satisfaction of the doctrine of respondeat superior when a valid lease is in effect and when a lessee's I.C.C. placards are adorning the window of the leased vehicle.

The majority of jurisdictions hold that Sections 1057.12 and 1043.1 create an irrebuttable presumption of the satisfaction of the doctrine of *respondeat superior*—that the driver and motor vehicle were in the service of the lessee—if, when an accident occurs, the lease is in effect and the lessee's I.C.C. placards are adorning the leased motor vehicle. See, *e.g., Rodriguez v. Ager* (C.A.10, 1983), 705 F.2d 1229; *Wellman v. Liberty Mut. Ins. Co.* (C.A.8, 1974), 496 F.2d 131; *Simmons v. King* (C.A.5, 1973), 478 F.2d 857; *Proctor v. Colonial Refrigerated Transp., Inc.* (C.A.4, 1974), 494 F.2d 89; *Mellon Natl. Bank & Trust Co. v. Sophie Lines, Inc.* (C.A.3, 1961), 289 F.2d 473. Thus, the majority view attaches liability to the lessee even if the driver embarks on an undertaking of his or her own while using the carrier-lessee's I.C.C. authority.

Courts adopting the majority view reason that the I.C.C.'s purpose behind the most recent revision was to ensure that "innocent victims" are compensated quickly and not entangled in lengthy court battles between the lessee, the lessor-owner, the driver, and those parties' insurance carriers to determine who is responsible for compensating the victim. Those courts determined that by establishing an irrebuttable presumption that whoever's placard is in the window at the time of the accident is responsible, the I.C.C.'s purpose in promulgating the new regulations—to ensure that "innocent victims" are compensated quickly—is furthered. The same courts advise that this presumption does not leave the lessee without a remedy, however. Those courts find that once the lessee whose placard adorned the window satisfies its responsibility to the victim, the lessee can argue that the motor vehicle was not actually being used "in its service" and pursue indemnification or contribution from the lessor-owner, the driver, or their insurance carriers.

On the contrary, the minority of jurisdictions hold that a written lease in combination with the display of the lessee's I.C.C. placard creates only a rebuttable presumption of the lessee's liability for the leased driver and truck which may be rebutted by applying traditional principles of respondeat superior. See, *e.g., Wilcox v. Transamerican Freight Lines* (C.A.6, 1967), 12 Ohio Misc. 162, 371 F.2d 403; *Gudgel v. S. Shippers, Inc.* (C.A.7, 1967), 387 F.2d 723; *John B. Barbour Trucking Co. v. Texas* (Tex.App.1988), 758 S.W.2d 684. Using the principles of *respondeat superior,* the lessee can rebut the presumption of liability by showing that the truck was not actually being used in the lessee's service at the time of the accident. In other words, the presumption is rebutted

if the lessee can prove that the driver deviated from his employment with the lessee on a mission of his own or was not using the truck for the benefit of the lessee. Those courts adopting the minority position reason that the I.C.C. regulations do not impose a greater liability on a carrier using leased equipment than that which arises when using its own equipment.

The Ohio Supreme Court first had the opportunity to interpret these new provisions in *Wyckoff Trucking, Inc. v. Marsh Bros. Trucking Serv., Inc.* (1991), 58 Ohio St.3d 261, 569 N.E.2d 1049. The Ohio Supreme Court determined that its holding in *Thornberry, supra,* that courts still had to visit the common-law test for *respondeat superior* to determine whether the lessee was liable for the leased truck and driver, no longer had vitality in light of the new I.C.C. provisions. The court found this to be true because its decision in *Thornberry* was based upon the language of Adm. Rule No. 4, which was less strong than the language used in Section 1507.12.

Relying on the language used in Section 1507.12, the court decided that when a lessee motor carrier's I.C.C. or P.U.C.O. placard is in the window of the truck at the time of the accident, the driver and truck are presumed to be under the employment of the lessee motor carrier and presumed to have been acting "in the service of" the motor carrier at the time of the accident. In other words, the *Wyckoff* court held that the I.C.C. and P.U.C.O. regulations create a statutory presumption of a master-servant relationship between the lessee and the driver and truck as well as a statutory presumption of the doctrine of *respondeat superior* when a valid lease is in existence and the lessee's placard is adorning the vehicle at the time of the accident.

The court explained its decision as follows:

"[S]trict construction of the I.C.C. regulations is more straightforward than the minority view and does a better job of advancing the interests of the public at large. Moreover, strict construction of the I.C.C. regulations will compel the carrier-lessee trucking company that displays its I.C.C. placards on the leased truck to scrupulously enforce safety standards on its leased vehicles, which are, by statutory definition, within its exclusive control, especially in light of the specter of liability. Above all, the majority view removes factual confusion attendant to determining which party is responsible for damages, thus relieving the innocent victim from sometimes interminable delays that accompany multiparty litigation, by focusing liability as it does, and forcing the trucking companies to allocate the various indemnification agreements among themselves. Once liability is fixed on the statutory employer, it is the statutory employer who must seek contribution or indemnification from other potentially responsible parties, not the innocent victim.

"In our view, the doctrine of statutory employment also serves a legitimate purpose in situations such as that presented herein, by clearly defining liability in cases arising in what can be characterized as the 'gray area' of liability. For instance, at the time of the accident herein, Bell was en route to Armco Steel in order to pick up a load for Marsh; but at any time prior to the actual pick-up of Marsh's goods on a trip lease, Rogers could have demanded use of Bell's rig under the terms of the master lease. Since the accident occurred prior to Bell's receiving of the Marsh load, and since Bell could have changed his mind prior to picking up the Marsh load at Armco Steel, the 'bright-line' guidelines set forth in the I.C.C. regulations under the majority viewpoint unmistakably fix liability for the accident instead of essentially forcing the innocent victim to sue everyone in order to redress his injuries and damages." *Id.*, 58 Ohio St.3d at 266, 569 N.E.2d at 1053.

As this court previously mentioned, intrastate motor carriers have been similarly regulated on the state level by the P.U.C.O. The P.U.C.O. has promulgated the following regulations which are similar to those promulgated by the I.C.C.:

"Augmenting Equipment

"Authorized carriers may perform authorized transportation in vehicles which they do not own only under the conditions specified in this rule, except that vehicles and equipment rented or leased from another authorized carrier may be utilized in interchange service only as provided in rule 4901:2–3–05 of the Administrative Code.

"(A) The contract, lease or other arrangement for the use of the equipment under this rule:

"* * *

"(3) Shall provide for the exclusive possession, control and use of the equipment during the full period of the lease, and for the complete assumption on the part of the lessee of full responsibility in respect of said equipment *during the period of the lease to the public* * * * and also provide for the exclusive control of the driver by lessee while operating the equipment covered by a contract, lease, or other arrangement * * *.

"(4) Shall specify the time and the date the agreement, contract, or lease begins and the time or circumstances on which it ends * * *.

"* * *

"The authorized carrier acquiring the use of the equipment under this rule shall correctly identify such equipment as operated by it during the period of the

contract, lease, or other arrangement, in accordance with the public utilities commission's requirements, and in the following manner:

"(1) There shall be displayed on both sides of the power unit thereof:

"(a) Company name, city and state of operating carrier;

"(b) Company number of vehicle; * * *

"* * *

"(5) The authorized carrier operating leased or rented equipment under these rules shall obliterate any legend showing it as the operating carrier displayed on such equipment, or shall remove any removable device showing it as the operating carrier, upon relinquishing possession of the equipment * * *." Ohio Adm.Code 4901:2–3–03.

With regard to the parties' respective responsibility to obtain insurance coverage, the Ohio legislature has enacted R.C. 4921.11, which deals with lessee P.U.C.O.-certified carriers' duty to maintain insurance or other form of surety to "protect the interests of the public" and "insure such company against loss sustained by reason of death of or injuries to persons and for loss of or damage to property resulting from the negligence of such company." R.C. 4921.11. The P.U.C.O. promulgated a complementary regulation in Ohio Adm. Code 4901:2–3–07, which prohibits a P.U.C.O.-certified carrier from entering into a lease agreement with a lessor-owner until the lessor-owner obtains liability insurance covering periods during which the motor vehicle is not being operated under a lease or is otherwise not in the use of a lessee. That section further provides, however, that the lessor-owner shall:

"(2) Not provide any coverage inuring to the benefit, either directly or indirectly, of any authorized carrier while the vehicle so insured as [sic] being operated under lease to or otherwise used by such carrier; nor shall any authorized carrier be named as an insured in the policy."

Taken together, these Ohio regulations, like their counterparts in federal law, have been thought to render the driver the statutory employee of the lessee. Furthermore, after *Wyckoff*, it was assumed that the language in the above-quoted portions of Ohio Adm.Code 4901:2–3–03 created a statutory presumption of the satisfaction of the doctrine of *respondeat superior* in Ohio when a valid lease was in existence and the lessee's P.U.C.O. placard adorned the window at the time of the accident. With this background in mind, we will return to the question at hand.

B

Argument

In its sole assignment of error, Cincinnati Insurance argues:

"The trial court erred in granting CNI's [Continental's] motion for summary judgment and denying appellant's motion for summary judgment where Haack was not operating Fugate's truck 'in the service' of Hageman or for Hageman's benefit at the time of the accident."

Cincinnati Insurance argues that Hageman's insurance policy does not cover the accident because the policy excluded coverage for liability assumed under any contract or agreement. The lease agreement between Hageman and Fugate required Fugate to obtain "all required as well as optional insurance coverage for public liability and property damage respecting the use of EQUIPMENT *while not being operated in the service of CARRIER* * * *." (Emphasis added.) To satisfy the terms of this provision, Fugate purchased "bobtail" and "deadhead" insurance coverage. The terms "bobtail" and "deadhead" are used in the trucking industry to mean, respectively, the operation of a truck without a trailer and the operation of a truck while pulling an empty load.

Cincinnati Insurance contends that, during the return trip to Hageman, Haack was not operating the truck "in the service of" Hageman under the above-quoted provision in the parties' lease agreement. Cincinnati Insurance contends that Haack was not acting "in the service of" Hageman during the return trip because the Miller Brother's job was canceled and because, as a consequence, Haack was not carrying a load on the return trip. Cincinnati Insurance maintains that because Haack was not carrying a load on the return trip, he was "deadheading." Assuming Haack was "deadheading," Cincinnati Insurance argues that the trial court should have found that Fugate's "deadhead" insurance covered the accident.

As support for its contention that Haack was "deadheading" at the time of the accident, Cincinnati Insurance quotes a commentator's explanation of "deadhead" insurance coverage:

"Delivering the truck or tractor to the lessee and returning it to the lessor's home base after a job is finished requires additional insurance to protect the lessor. During these periods known as 'bobtailing,' when the tractor is disattached from a trailer and is being driven as a single unit, or 'deadheading,' when a tractor is pulling an empty trailer, either before a job is commenced, or after one has been completed, the lessee's insurance coverage is only in effect if the lessor's vehicles are being put to the lessor's business use. Otherwise the use being put to the vehicle is the lessor's own. Under insurance parlance, this latter

circumstance is known as 'non-trucking use.' " Nissenberg, The Law of Commercial Trucking: Damages to Persons and Property (1994) 648, Section 14–6(a).

Assuming Haack's deadhead insurance covered the accident, Cincinnati Insurance argues that because Fugate acquired the deadhead insurance to satisfy his assumed responsibility under the lease agreement to obtain insurance for periods when the vehicle was "not being used in the service of" Hageman, the trial court should have found that the exclusion in Cincinnati Insurance's policy, for liability assumed under an agreement, operated to exclude coverage for this accident.

We are unpersuaded by Cincinnati Insurance's argument, and agree with the trial court's ultimate decision that Cincinnati Insurance was responsible for Fugate's truck at the time of the accident. We reach this conclusion, however, by following our prior precedent set forth in *Ohio Cas. Ins. Co. v. United S. Assur. Co.*, 85 Ohio App.3d 529, 620 N.E.2d 163, rather than through the analysis used by the trial court. In *Ohio Cas.*, we held that the Supreme Court's decision in *Wyckoff*, 58 Ohio St.3d 261, 569 N.E.2d 1049—that the lessee is statutorily presumed to be responsible for a leased vehicle when a valid lease is in existence and the lessee's P.U.C.O. placard is adorning the window of the vehicle—could be extended to settle the dispute between the owner's and lessee's insurer as to which was responsible for the vehicle at the time of the accident. Specifically, we held that the lessee's insurer is presumed to be responsible for the leased motor vehicle if, at the time of the accident, the lessee's placard is in the window of the vehicle and a valid lease is in existence.

The trial court declined to follow our holding in that case because subsequent to *Ohio Cas.* the legislature passed R.C. 2307.34, which some argue has legislatively overruled the Ohio Supreme Court's decision in *Wyckoff*, the case upon which our decision rested. Rather than following our prior precedent, the trial court determined that Cincinnati Insurance was responsible for the truck by considering whether Cincinnati Insurance's policy covered the truck at the time of the accident. The trial court determined that Cincinnati Insurance's exclusion for liability assumed under an agreement did not operate to bar coverage because Fugate only assumed liability for periods when the vehicle was not being used "in the service of" Hageman, and the trial court determined that the vehicle was being used in the service of Hageman at the time of the accident.

Unlike the trial court, we find that R.C. 2307.34(C) has not invalidated the Supreme Court's holding in *Wyckoff*, and that, therefore, our decision in *Ohio Cas.* remains good law. R.C. 2307.34(C) concerns a lessee's liability with regard to leased motor vehicles; it provides:

"No motor carrier authorized by the public utilities commission to conduct operations in this state shall be liable in civil damages for any death, injury, or loss caused by a motor vehicle not owned by the motor carrier, * * * unless the

motor vehicle is being operated in the service of the motor carrier pursuant to a valid lease agreement at the time the injury or damage occurs. The unauthorized display of a motor carrier's name on a motor vehicle not owned by the motor carrier shall not be grounds for imposing any civil liability on the motor carrier." (Emphasis added.)

There is some question as to whether the legislature intended by its restriction of motor carriers' liability to instances where the motor vehicle was operated "in the service of" the lessee to return Ohio law to the test announced in *Thornberry*, 164 Ohio St. 395, 58 O.O. 189, 131 N.E.2d 383, that is, whether one must still visit the common-law test for *respondeat superior* to determine whether the lessee may be held liable for the motor vehicle. Whether this section has negated *Wyckoff*'s finding of the lessee's statutory presumption of responsibility has not as of yet been determined by Ohio courts.

In our view, R.C. 2307.34 is entirely consistent with the court's holding in *Wyckoff*. Significant to our decision is the language in paragraph (C) that follows and modifies the phrase "in the service of the motor carrier." The "in the service of" language is modified by the phrase "pursuant to a valid lease agreement." R.C. 2307.34(C). When these phrases are read in conjunction, the meaning of the sentence becomes that a lessee motor carrier cannot be held liable for damages caused by a leased truck or driver unless the motor vehicle was being operated "in the service of" the lessee according to the parties' lease agreement.

It appears from this language that the legislature merely intended to refer the definition of "in the service of" to the lease agreement. As we explained earlier, the contents of lease agreements are governed in Ohio by the P.U.C.O. regulations. The P.U.C.O. requires, among other things, that the parties place certain words and phrases in the parties' lease agreement that serve to delegate responsibility for the leased motor vehicle to the lessee. As explained earlier, the words and phrases mandated by the P.U.C.O. lease agreement requirements (which are similar to those in the I.C.C. regulations) have been considered to create a statutory presumption that the driver and the truck are being used "in the service of" the lessee when a valid lease is in existence and the lessee's placard is adorning the window.

In particular, to restate, the P.U.C.O. requires under Ohio Adm. Code 4901:2–3–03 that the parties' lease agreement provide that during the existence of the lease, the lessee take the "exclusive possession and control" of the motor vehicle and "complete assumption * * * of full responsibility" for the motor vehicle "during the period of the lease [with regard] to the public" as well as "provide for the exclusive control of the driver while operating" the motor vehicle "covered by a contract, lease, or other arrangement." Furthermore, Ohio Adm. Code 4901:2–3–03 requires the parties to define in their lease agreement when the lease begins

and when or under what circumstances it ends. The P.U.C.O. further requires that the lessee "identify such equipment [with a placard] as operated by it during the period of the contract, lease, or other arrangement, in accordance with the public utilities commission requirements" and that the lessee "shall obliterate any legend showing it as the operating carrier displayed on such equipment, or shall remove any removable device showing it as the operating carrier, upon relinquishing possession of the equipment." Ohio Adm.Code 4901:2–3–03. The P.U.C.O. also prohibits under Ohio Adm. Code 4901:2–3–07 lessees from entering into lease agreements with lessors until the lessors have obtained insurance, but expressly prohibits owner-lessors from obtaining insurance covering periods while the vehicle is being operated under a lease.

In view of the adjoining phrase "pursuant to a valid lease agreement," we find that the legislature intended to refer the definition of "in the service of" to the lease. We further find that the above P.U.C.O. lease requirements, by requiring that certain words and phrases are used in the lease agreements to delegate responsibility for the motor vehicle to the lessee, create a presumption that the motor vehicle is being operated "in the service of" the lessee when a valid lease is in existence and when the lessee's P.U.C.O. placard is in the window. Consequently, we determine that rather than invalidating the law as established under *Wyckoff,* and reviving the common-law *respondeat superior* test, R.C. 2307.34 codifies *Wyckoff*'s finding of a statutory presumption of the satisfaction of the doctrine of *respondeat superior.*

We find that our reading of this paragraph is necessary to a consistent reading of the entire statute. The remainder of the statute concerns insurers' right to contribution. The statute provides that the lessee's insurer is the "primary insurer" and that the owner's insurer is the "secondary insurer." It further provides that the "primary insurer" can bring a cause of action for contribution if the accident occurs while the driver is engaged in "nontrucking activity." One of the definitions of "nontrucking activity" is "any operation of the leased vehicle that is *not for the benefit of* the lessee." (Emphasis added.) R.C. 2307.34(A)(2)(a).

In our opinion, if the legislature meant the phrase "in the service of" to revive the common-law test of *respondeat superior,* then an insurer would never be able to bring an action for contribution on the ground that the vehicle was not being used "for the lessee's benefit." This is true because for a lessee's insurer to be entitled to contribution on that basis, the motor vehicle would have to be able to be used "in the service of" the lessee and simultaneously not be used "for the benefit of" the lessee. We find that this is impossible because it is only logical that a commercial motor vehicle is always being used "for the benefit of" the lessee when the vehicle is being used "in the service of" the lessee.

We do recognize that the opposite may be true, however. Conceivably in the lexicon of the phrase "for the benefit of" a vehicle could be used for one's ancillary benefit without being used in one's "service." Nonetheless, when one interprets the statute as reviving the common-law *respondeat superior* test, a lessee still cannot be held liable under the statute unless the vehicle was being used "in its service" under common-law standards. Thus, a lessee could not be held liable if the vehicle was merely being used "for its benefit" but not "in its service."

Furthermore, given that an insurer's liability for a vehicle is predicated on its insured's liability, a lessee's insurer likewise could not be held liable when a vehicle was used "for the lessee's benefit," but not "in the lessee's service." Correspondingly, the lessee's insurer could *never* be entitled to contribution under R.C. 2307.34(A)(2)(a) on the basis that the vehicle was not being used "for the benefit of" the lessee. Based upon this reasoning, we can only find that interpreting the statute as having revived the common-law *respondeat superior* test would render a portion of the statute meaningless.

Thus, instead, we determine that the legislature must have included that basis for contribution because it recognized the continued vitality of the *Wyckoff* decision, that is, that a truck and driver are presumed to be "in the service of" the lessee regardless of whether the vehicle is actually being used "in its service" when a valid lease is in existence and its placard is adorning the window. The legislature must have determined that because a lessee (and its insurer) can be presumed to be responsible for the truck and driver even though the truck and driver may not have in reality been used "in its service," the lessee and its insurer may at least seek contribution from other parties when the vehicle is found to not have been used "for its benefit."

As we stated earlier, because we believe that *Wyckoff* and *Ohio Cas.* remain good law, we would perform a different analysis from that used by the trial court. Instead of looking to the terms of the parties' insurance contracts to determine which insurer was responsible for the motor vehicle at the time of the accident, we would first ask whether the statutory presumption of the lessee's liability set forth under *Wyckoff* applies, that is, whether a valid lease was in existence at the time of the accident and whether the lessee's placard was adorning the window of the truck. If the statutory presumption of the lessee's liability does apply, we would next determine whether under our extension of *Wyckoff* in *Ohio Cas.* the presumption of liability may be applied to the lessee's insurer.

After reviewing the record, we determine that a valid lease, which in accordance with the P.U.C.O. requirements placed Fugate's truck under the "exclusive possession and control" and "complete responsibility" of Hageman, was in existence at the time of the accident. Furthermore, we determine that

Hageman's placard was adorning the window at the time of the collision. Therefore, we find that Hageman, the lessee, is statutorily presumed to have been the master of Fugate's truck at the time of the accident and that it is statutorily presumed that Fugate's truck was being used "in the service" of Hageman at the time of the accident.

■ Having found that Hageman is presumed to be responsible for the truck at the time of the accident, we must now consider whether this presumption of responsibility can be extended to Hageman's insurer, Cincinnati Insurance. As we explained earlier, this court held in *Ohio Cas.* that the presumption of responsibility that applies between the lessee and the public also applies to disputes between the insurers of the lessee and the owner as to who was primarily responsible for the vehicle at the time of the accident.[3] Judge Wolff, writing the majority opinion of the court, explained that because the doctrine of statutory employment irrefutably establishes the liability of the carrier-lessee, the doctrine should also establish that the lessee's insurer is responsible for coverage. *Id.*, 85 Ohio App.3d at 533, 620 N.E.2d at 165–166. Judge Wolff found that, otherwise, the purpose behind the statutory presumption of the lessee's liability—to prevent public confusion as to who was financially responsible for accidents caused by ICC-licensed carriers and to save injured parties from long court battles and interminable delays in receiving compensation—would be defeated. Judge Wolff further determined that to hold the lessee statutorily liable but not find that the lessee's insurance is triggered at best yields an inconsistent result. *Id.*

Our finding of a presumption of the lessee's insurer's liability did not leave the insurer without any recourse, however. We limited the application of the presumption to disputes between insurance carriers as to who was primarily responsible for the motor vehicle. Once the lessee's insurer satisfies its primary obligation to the injured party, it may seek contribution from other responsible parties. The lessee's insurer, for instance, may seek contribution from the secondary insurer, the insurer of the owner, because the vehicle under R.C. 2307.34 was being used in "nontrucking activity" at the time of the accident. In particular, the insurer may argue that it is entitled to contribution because the truck was "not being used for the benefit" of the lessee at the time of the accident. If proven, the insurer would be entitled to contribution or indemnification from the secondary insurer.

---

**3.** Our decision was followed by the Tenth District Court of Appeals in *Canal Ins. Co. v. Brogan* (1994), 93 Ohio App.3d 765, 639 N.E.2d 1219. Additionally, R.C. 2307.34 can be interpreted as codifying, or at least supporting, our holding in *Ohio Cas.* R.C. 2307.34 provides that the lessee's insurer is the primary insurer and the lessor-owner's insurer is the secondary insurer.

Applying our analysis in *Ohio Cas.* to the present case, we find that the presumption of Hageman's responsibility for Fugate's truck extends to Hageman's insurer, Cincinnati Insurance. We determine that the extension of the liability to the lessee's insurer is necessary to effectuate the purpose behind the presumption of the lessee's liability. As we discussed earlier in this opinion, the majority of courts determine that in disputes between a lessee and an injured party, the lessee is presumed to be liable to a victim if, at the time of the accident, a valid lease was in existence and the lessee's placard was adorning the window of the vehicle. It appears, however, that many courts do not extend the presumption of liability to disputes between the insurers as to who is primarily liable to the injured party. Rather, it seems that a good number of courts allow the insurers to haggle out in court whether under the facts and the terms of their insurance policies they were intended to be liable. See, *e.g., Occidental Fire & Cas. Co. v. Padgett* (1983), 113 Ill.App.3d 215, 68 Ill.Dec. 766, 446 N.E.2d 937.

The failure of courts to extend the presumption liability to the lessee's insurer has created many problems in accomplishing the purpose behind the I.C.C.'s statutory presumption of the lessee's liability. The I.C.C. created the presumption of statutory liability to prevent public confusion as to who is responsible for accidents caused by I.C.C.-licensed carriers and to save injured parties from lengthy court battles and interminable delays in receiving compensation. Without the extension of the presumption of responsibility to the lessee's insurer, however, receiving compensation from the lessee is far from easy. *Simpkins*, 94 Ill.App.3d 951, 50 Ill.Dec. 449, 419 N.E.2d 557.

The lessee is required to obtain insurance coverage for injuries occurring while the motor vehicle is statutorily presumed to be in its service. Ohio Adm. Code 4901:2–3–03 (providing that lessee must obtain insurance covering periods in which the motor vehicle is being operated under a lease). Thus, after it is determined that the lessee meets the test for the presumption of statutory liability, the lessee will argue that its insurance policy, which the lessee acquired to cover instances when it is found to be statutorily responsible, covered the accident. However, without extending the presumption of liability to the lessee's insurer, its insurer will in turn argue that its policy was not intended to cover the accident or at least that its policy was only intended to provide secondary coverage. The lessee's insurer will argue that, instead, one of the other parties' insurance policies was intended to be liable under the terms of the policies and facts of the case.

It therefore follows that the failure to extend the presumption of liability could draw the injured party into a battle with as many as four insurance carriers disputing liability. "The seeds of confusion inherent in this situation are exacerbated by conflicting policy provisions and exclusions among the policies and the

natural tendency of each insurer to claim that its coverage is excess only and that the others are primary." Nissenberg, *supra*, at 656. Hence, the purposes of the presumption of statutory liability—to prevent public confusion as to who is responsible for accidents and to save injured parties from lengthy court battles and interminable delays in receiving compensation—are in effect defeated by the failure to extend the presumption of liability to the lessee's insurer.

Seemingly in response to the problem of courts not extending the presumption of liability to the lessee's insurer, the I.C.C. created a form endorsement that is required to be attached to any liability policy issued to an I.C.C. certified interstate carrier. See Section 1003.3, Title 49, C.F.R. It is clear that the endorsement contains language intended to eliminate the possibility of a denial of coverage by an insurer based upon limiting provisions in the lessee's policy. Courts, however, have been divided as to whether and under what circumstances this endorsement extends the presumption of the lessee's liability to the lessee's insurer.

Some courts find that the endorsement was intended to extend the presumption of the lessee's primary liability to the lessee's insurer regardless of whether the dispute is between the insurer and the injured party or solely between insurers. *E.g., Empire Indemn. Ins. Co. v. Carolina Cas. Ins. Co.* (C.A.5, 1988), 838 F.2d 1428. Other courts have found that the endorsement only negates the policy's limiting provisions, leaving intact the insurer's right to claim that it is not primarily responsible to the injured party. *E.g., Am. Gen. Fire & Cas. Co. v. Truck Ins. Exchange* (D.Kan.1987), 660 F.Supp. 557. Finally, yet other courts find that the endorsement extends the presumption of liability to the lessee's insurer, but that the presumption of liability only applies between the lessee's insurer and the injured party. *E.g., Carter v. Vangilder* (C.A.5, 1986), 803 F.2d 189. Those courts hold that disputes among insurance carriers should be decided upon the contractual arrangements of the parties and state law. *E.g., Carolina Cas. Ins. Co. v. Underwriters Ins. Co.* (C.A.5, 1978), 569 F.2d 304.

We find that the view we have taken in *Ohio Cas.* best accomplishes the purpose behind the statutory presumption of the lessee's responsibility. More specifically, we are convinced that extending the statutory presumption of liability to the lessee's insurer prevents public confusion as to who is responsible for accidents caused by P.U.C.O.-licensed carriers and saves injured parties from lengthy court battles and interminable delays in receiving compensation. In addition, this approach avoids the inconsistent result of finding that the lessee is statutorily presumed to be responsible but not finding that the lessee's insurance is triggered.

■ It is worthy of mention, however, that even if we were to find that the presumption of liability does not extend to a lessee's insurer, we would find, as

the trial court did here, that Cincinnati Insurance's exclusion for liability assumed under an agreement does not operate to bar coverage in this case. We are convinced that Cincinnati Insurance's argument that its policy exclusion was implicated because Haack was deadheading at the time of the accident is devoid of merit. As stated earlier, Fugate was required under the lease to obtain insurance coverage for any period when the vehicle was not being used "in the service of" Hageman. To satisfy this responsibility, Fugate obtained "deadhead" and "bobtail" insurance coverage.

While we agree that Haack was deadheading at the time of the accident, the mere fact that one is deadheading does not also mean that the vehicle is not being used "in the service of" a lessee. It is clear that the term "deadheading" is not synonymous with the phrase "not being used in the service of." Thus, when a truck is deadheading, one must still ask whether the truck is being used "in the service of" the lessee to determine whether an exclusion like the one in this case applies. This is illustrated by the following excerpt from a treatise on the topic of motor carrier liability:

"The most common problem is that of determining whether a truck is operating in the lessee's business while on the way to pick up a load or when returning an empty trailer after unloading [deadheading]. *It is during these times that bobtail* [and deadhead] *insurance would seem to apply but usually does not since driving bobtail or deadheading can only constitute a nontrucking use of the truck when the truck is not being used in the service of the lessee carrier.* Thus it has been held that a trucker * * * while deadheading on the way to pick up a load arranged by the lessee or when returning an empty trailer is using the truck in the lessee's business." Nissenberg, *supra*, at 652.

Whether a truck and driver are being used "in the service of" the lessee when the truck is deadheading depends on whether the truck and driver were engaged in an activity that was "for the benefit of" or "in furtherance of" the lessee's commercial interests.

The similar issue of whether a truck was being operated "in the business of" the lessee on a return trip was considered in *St. Paul Fire & Marine Ins. Co. v. Frankart* (1977), 69 Ill.2d 209, 13 Ill.Dec. 31, 370 N.E.2d 1058. In *St. Paul,* the lessor's insurance policy provided coverage for accidents occurring during non-trucking uses and excluded coverage for accidents occurring while the vehicle was being "used in the business" of a lessee. The court considered whether the truck and driver were still acting "in the business of" a lessee on a return trip after delivering a load for the lessee. The court determined that an assignment for a lessee does not terminate until the owner-driver returns to the point where the haul originated, to the terminal from which the haul was assigned, or to the driver's home terminal from which he customarily obtained his next assignment.

Applying this test, the court determined that the driver-owner was acting "in the business of" the lessee during the return trip from the delivery of the load because at the time of the accident the driver and truck were in route to the driver's home terminal.

We agree with the view espoused in *St. Paul,* and applying this reasoning to the facts before us, we determine that Haack was acting "in the service of" Hageman on the return trip. We are convinced that Haack was acting in the service of Hageman because Haack's assignment for Hageman would not have terminated until Haack returned to the point where the haul originated, to the terminal from which the haul was assigned, or to Haack's home terminal where he customarily obtained his next assignment, which in this case were all the same, that is, Hageman's terminal. Because Haack was returning to Hageman's terminal at the time of the accident (and not on a mission for his own benefit or for another lessee), Haack would still have been considered to be acting "in the service of" Hageman at the time of the accident. Thus, Fugate's assumed responsibility for liability insurance while the vehicle is not being operated in the service of Hageman would not apply, and, correspondingly, Cincinnati Insurance's exclusion for liability assumed under an agreement would not operate to bar coverage.

In conclusion, we find that a lessee is presumed to be responsible for a leased truck and driver when a valid lease is in existence and the lessee's P.U.C.O. placard is adorning the window of the leased truck. We further find that to effectuate the purpose of this presumption of liability—to ensure that innocent victims are compensated quickly—this presumption of liability may be extended to the lessee's insurer. The lessee's insurer, however, may seek contribution from the lessor or lessor's insurer under R.C. 2307.34 if, for example, the vehicle was not being used "for the benefit of" the lessee at the time of the accident. We also mention that even if we had found that the presumption of liability cannot be extended to the lessee's insurer, we would have concluded that the truck was being used in the service of Hageman, the lessee, at the time of the accident. Furthermore, as a consequence, we would have found that Cincinnati Insurance's exclusion for liability assumed under an agreement would not operate to bar coverage in this case.

As to Fugate's cross-appeal, Fugate argues that the trial court should have found that Cincinnati Insurance has a duty to defend and indemnify him in any action brought against him. Because we have found that Hageman and Cincinnati Insurance were responsible for the truck at the time of the accident, future actions against Fugate by an injured party are impossible. As such, we find that it is unnecessary to require Cincinnati Insurance to defend or indemnify Fugate.

Accordingly, we affirm the trial court's denial of Fugate's motion for summary judgment.

Based upon the foregoing, we affirm the decision of the trial court, albeit on different grounds.

*Judgment affirmed.*

FAIN and GRADY, JJ., concur.