OPINION
{¶ 1} Appellant, Mark Thompson, was injured following a motor vehicle accident that occurred on March 22, 2000, on State Line Road in Poland Township, Ohio. Thompson's motor vehicle collided with a semi-tractor-trailer owned and operated by Hasan Eroglu. At the time of the accident, Eroglu was transporting a load of waste from Hunt's Point Recycling in New York to a landfill in Mahoning County. Eroglu was operating under the business name H E Trucking Inc.
 {¶ 2} Eroglu was transporting the load on behalf of Appellee Trinity Transportation Corporation ("Trinity"). However, Trinity had contracted with another company, MJ Transport, to have the load hauled. It was MJ Transport which contacted Eroglu to complete the job.
 {¶ 3} Eroglu had liability insurance from Appellee, Empire Fire and Marine Insurance Company ("Empire"). However, Empire refused to defend Eroglu in the instant matter claiming that Eroglu's policy had been canceled prior to the accident. Appellant secured a default judgment against Eroglu, dba H E Trucking, because the tortfeasor failed to appear or defend. The trial court then granted Appellant permission to pursue Empire directly in a declaratory judgment action. The trial court also determined that New Jersey law governs Eroglu's policy of insurance with Empire. (Nov. 10, 2004, Judgment Entry.)
 {¶ 4} Thompson filed suit seeking compensation for his injuries from Eroglu dba H E Trucking Inc., Trinity, Empire, and several others. Although Appellant named other defendants in his complaint, the instant appeal involves only Trinity and Empire.
 {¶ 5} Appellees Trinity and Empire filed separate motions for summary judgment. The trial court granted Trinity summary judgment. Empire was initially denied summary judgment. (Jan. 19, 2005, Judgment Entry.) The trial court subsequently granted Empire's motion for reconsideration and entered summary judgment in its favor, also. (Feb. 10, 2005, Judgment Entry.)
 {¶ 6} Appellant timely appealed to this Court. However, we sent the matter back to the trial court until such time as the judgment entries were amended to reflect the necessary Civ. R. 54(B) language. The trial court subsequently amended its entries, and the matter is now properly before this Court. (May 23, 2005, Amended Judgment Entries.)
 {¶ 7} Appellant raises two assignments of error on appeal. He argues that the trial court erred in granting Empire summary judgment since its policy of insurance for Eroglu, dba H E Trucking, was in effect at the time of the accident. Appellant also claims that the trial court erred in granting Trinity summary judgment because the tortfeasor, Eroglu, was acting as Trinity's agent at the time of the accident. For the following reasons, however, we hereby affirm summary judgment in both Empire and Trinity's favor.
 {¶ 8} Appellant's first assignment of error concerns the trial court's decision to grant Empire summary judgment. Appellant claims:
 {¶ 9} "THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO PLAINTIFF/APPELLANT WHEN IT SUSTAINED THE MOTION FOR SUMMARY JUDGMENT OF EMPIRE FIRE AND MARINE INSURANCE COMPANY AND FOUND THAT IT WAS ENTITLED TO JUDGMENT IN ITS FAVOR AS A MATTER OF LAW."
 {¶ 10} An appellate court conducts a de novo review of a trial court's decision to grant summary judgment without affording any deference to the trial court's decision. Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102, 105, 671 N.E.2d 241; Brown v. Scioto Cty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153. De novo means that an appellate court uses the same standard that the trial court should have used in examining the evidence to determine if genuine issues of material fact exist for trial. Brewer v. Cleveland City Schools (1997),122 Ohio App.3d 378, 383, 701 N.E.2d 1023. The goal of summary judgment is not to try issues of fact, but to assess whether issues of fact exist. Lakota Loc. School Dist. Bd. of Edn. v. Brickner (1996),108 Ohio App.3d 637, 671 N.E.2d 578.
 {¶ 11} "Summary judgment is appropriate where it appears that (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." AmerifirstSavings Bank of Xenia v. Krug (1999), 136 Ohio App.3d 468, 483,737 N.E.2d 68, citing Harless v. Willis Day Warehousing Co., Inc. (1978),54 Ohio St.2d 64, 66, 375 N.E.2d 46, 47; Civ. R. 56(C).
 {¶ 12} The Supreme Court of Ohio has explained the procedure for making summary judgment determinations. Dresher v. Burt (1996),75 Ohio St.3d 280, 293, 662 N.E.2d 264. Initially, the moving party must identify evidentiary materials showing there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Then, and if the moving party meets this burden, a burden is placed on the nonmoving party to demonstrate that there is a genuine issue of fact for trial. Id.; Civ. R. 56(E).
 {¶ 13} As stated earlier, the trial court allowed Appellant to proceed directly against Empire in its declaratory judgment action. The trial court also determined that New Jersey law governs the interpretation of the Empire policy of insurance. (Nov. 10, 2004, Judgment Entry.)
 {¶ 14} Appellant argued to the trial court and he claims on appeal that Empire did not properly cancel its insurance policy with Eroglu. Specifically, Appellant argues that Empire's cancellation was ineffective because of the failure to notify the appropriate federal agency of cancellation of Eroglu's liability insurance in accordance with N.J. Stat. § 17:16D-13(d). In response, Empire claims that it did not insure Eroglu for interstate carrier purposes, and as such, it was not required to notify any federal agency.
 {¶ 15} N.J. Stat. § 17:16D governs the cancellation of insurance contracts by premium finance companies for the nonpayment of premiums. Subsection d requires compliance with all applicable statutes and regulations that require notice to be given to a governmental agency. N.J. Stat. § 17:16D-13 states:
 {¶ 16} "(a) When a premium finance agreement contains a power of attorney enabling the premium finance company to cancel any insurance contract or contracts listed in the agreement, the insurance contract or contracts shall not be cancelled [sic] by the premium finance company unless such cancellation is effectuated in accordance with this section.
 {¶ 17} "(b) Not less than 10 days' written notice shall be mailed to the insured of the intent of the premium finance company to cancel the insurance contract unless the default is cured within such 10-day period. A copy of said notice shall also be sent to the insurance agent or insurance broker indicated on the premium finance agreement.
 {¶ 18} "(c) After expiration of such 10-day period, the premium finance company may thereafter request in the name of the insured, cancellation of such insurance contract or contracts by mailing to the insurer a notice of cancellation, and the insurance contract shall be canceled as if such notice of cancellation had been submitted by the insured himself, but without requiring the return of the insurance contract or contracts. The premium finance company shall also mail a notice of cancellation to the insured at his last known address and to the insurance agent or insurance broker indicated on the premium finance agreement. The effective date of such cancellation shall not be earlier than 3 days after the date of mailing of such notice to the insured and to the insurance agent or insurance broker.
 {¶ 19} "(d) All statutory, regulatory, and contractual restrictions providing that the insurance contract may not be canceled unless notice is given to a governmental agency, mortgagee, or other third party shall apply where cancellation is effected under the provisions of this section. The insurer shall give the prescribed notice in behalf of itself or the insured to any governmental agency, mortgagee, or other third party on or before the second business day after the day it receives the notice of cancellation from the premium finance company and shall determine the effective date of cancellation taking into consideration the number of days notice required to complete the cancellation."
 {¶ 20} Specifically, Appellant asserts that Empire failed to provide notice in compliance with 49 U.S.C. § 13906 and 49 C.F.R. § 387.15. As such, Appellant argues that Eroglu's liability coverage should be considered to be in effect at the time of the motor vehicle accident and he is entitled to coverage. We note that Appellant's argument is very limited, and it fails to explain why Eroglu and Empire are subject to these federal regulations.
 {¶ 21} The Federal Motor Carrier Act of 1980 and its predecessor, the Interstate Commerce Commission Act, were enacted to establish minimum insurance requirements and responsibility in allocating losses involving trucking companies. The requirements were designed in part to ensure that commercial motor carriers have adequate insurance coverage to protect the general public. Northland Insurance Co. v. New HampshireInsurance Co. (D.N.H., 1999), 63 F.Supp.2d 128, 133. The regulations were also designed to prevent carriers from using leased or non-owned vehicles to avoid safety requirements and to prevent confusion as to liability arising from accidents caused by these non-owned vehicles.Empire Fire and Marine Ins. v Guaranty National Ins., (10th Cir. 1989),868 F.2d 357, 362.
 {¶ 22} Title 49 U.S.C. § 13906 is the current version of the Motor Carrier Act of 1980. The Act authorized the adoption of regulations to further its purpose. Northland Insurance Co., supra, at 133-134. Thus, regulations were established requiring interstate motor carriers to maintain minimum liability insurance and to file proof of insurance with the Federal Motor Carrier Safety Administration ("FMCSA"). Id. at 134. The regulations prescribed by the Secretary of Transportation require a base coverage amount of at least $750,000 to fulfill the financial responsibility requirement.
 {¶ 23} The requisite insurance must contain Endorsement MCS 90 before a trucking company can secure a permit for interstate hauling.49 U.S.C.S. § 13906(f); 49 C.F.R. § 387.7. The MCS 90 Endorsement is commonly referred to as an "ICC [Interstate Commerce Commission] endorsement." Barbarula v. Canal Ins. Co. (D.Conn. 2004),353 F. Supp. 2d 246, 254.
 {¶ 24} The insurance and endorsement obligate the insurer to pay the injured party regardless of any coverage defenses against the insured. The endorsement has been referred to as a suretyship by the insurance company to protect the public. Travelers Indem. Co. of Illinois v.Western American Specialized Transp. Services, Inc., (5th
Cir. 2005), 409 F.3d 256. The insurer may subsequently recover its payment from its insured.
 {¶ 25} The approved MCS 90 Endorsement definitions section states:
 {¶ 26} "It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company." 49 C.F.R. § 387.15.
 {¶ 27} Once the MCS 90 Endorsement is issued and the requisite form is filed, the endorsement coverage remains in effect until it is canceled in accordance with the federal regulations. Northland InsuranceCo., supra, 63 F. Supp.2d 128, 134. In order to cancel an MCS 90 Endorsement, the insurer must provide the insured with notice 35 days before cancellation and the FMCSA with notice 30 days before cancellation. 49 CFR § 387.7; 49 CFR § 387.413(d). The approved form for the MCS 90 Endorsement states in part:
 {¶ 28} "Cancellation of this endorsement may be effected by the company or the insured by giving (1) thirty-five (35) days notice in writing to the other party * * * , and (2) if the insured is subject to the FMCSA's jurisdiction, by providing thirty (30) days notice to the FMCSA * * * ." 49 C.F.R. § 387.15.
 {¶ 29} In considering the applicability of the MCS 90 endorsement, courts must construe its effect and operation pursuant to federal law.Lynch v. Yob (2002), 95 Ohio St.3d 441, 445, 768 N.E.2d 1158, citingFord Motor Co. v. Transport Indemn. Co. (C.A.6, 1986), 795 F.2d 538,545.
 {¶ 30} In the instant case, Empire argues that its policy was effectively canceled before the accident on March 22, 2000. However, Appellant claims that said cancellation was ineffective or at least that summary judgment was inappropriate because Empire failed to establish that the requisite notice was given to the FMCSA. Based on our review of the limited record provided by the parties, this argument must fail.
 {¶ 31} The trial court's record reveals that Empire issued a commercial lines trucker's liability policy of insurance numbered CL 76 08 34 to Hasan Eroglu dba H E Trucking for the policy period of July 6, 1999 to July 6, 2000. The policy identifies Eroglu's business description as "TRASH." The commercial auto coverage declaration page identifies the named insured as, "H E TRUCKING HASAN EROGLU DBA" and identifies the form of the business as "Individual." The policy provided $1,000,000 in liability coverage. (Commercial Auto Coverage Part Truckers Declarations.)
 {¶ 32} The Empire policy SCHEDULE OF COVERED AUTOS YOU OWN identifies one vehicle, a 1990 KW Tractor which is principally garaged in New Jersey. It also includes, "ANY NON OWNED TRAILER WHILE ATTACHED TO A SCHEDULED UNIT."
 {¶ 33} The Empire policy provides under the COMMON POLICY CONDITIONS:
 {¶ 34} "All Coverage Parts included in this policy are subject to the following conditions.
 {¶ 35} "A. Cancellation
 {¶ 36} "1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.
 {¶ 37} "2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:
 {¶ 38} "a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium * * *
 {¶ 39} "* * *
 {¶ 40} "3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.
 {¶ 41} "4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.
 {¶ 42} "* * *
 {¶ 43} "6. If notice is mailed, proof of mailing will be sufficient proof of notice." (COMMON POLICY CONDITIONS, page 1 of 1.)
 {¶ 44} Empire argued in its motion for summary judgment that Eroglu's policy was effectively canceled, and it provided undisputed evidence that the policy had been canceled prior to the March 22, 2000, accident involving Appellant.
 {¶ 45} Eroglu financed his Empire policy premiums through the insurance premium finance company, Premium Payment Plan ("PPP"), according to the affidavit of Arlene Schmatz, the records custodian for PPP. Eroglu was required to make eight premium installments and in exchange, PPP was to pay the premiums due to Empire. (Affidavit of Arlene Schmatz.)
 {¶ 46} Eroglu also appointed PPP in the premium finance agreement as his power of attorney. This agreement entitled PPP to cancel Eroglu`s policy of insurance if he failed to make his loan payment to PPP. Upon Eroglu's nonpayment of premium, the power of attorney required PPP to provide Eroglu with mailed notice of its intent to cancel the policy. It then provided Eroglu 13 days to make his overdue payment. If payment was not received within those 13 days, then PPP was to mail notice of its intent to cancel the policy directly to the insurer, Empire. (Affidavit of Arlene Schmatz; PPP Agreement, ¶ 3.)
 {¶ 47} In its motion for summary judgment, Empire argued that Eroglu's policy of insurance was effectively canceled for the nonpayment of his premium by PPP in accordance with New Jersey law. According to Schmatz, Eroglu failed to make his October 5, 1999, payment to PPP. As a result, PPP mailed Eroglu notice of its intent to cancel the Empire policy of insurance for the nonpayment of premium on October 15, 1999. PPP did not thereafter receive Eroglu's payment. Hence, PPP mailed Empire and Eroglu notice of cancellation of Eroglu's policy on November 5, 1999. (Affidavit of Arlene Schmatz.) Empire subsequently canceled Eroglu's policy on November 8, 1999 for the nonpayment of the premium. (Affidavit of Jacqueline L. Yohe.)
 {¶ 48} Based on the foregoing, Empire effectively canceled Eroglu's policy of insurance in compliance with New Jersey law that requires a ten-day notice of intent to cancel to be issued to the insured. N.J. Stat. § 17:16D-13(b)-(c).
 {¶ 49} Appellant does not dispute the foregoing. He argues instead that Empire failed to prove that it effectively canceled Eroglu's commercial liability policy because Empire did not establish that notice of the cancellation of Eroglu's commercial liability policy was sent to the FMCSA.
 {¶ 50} Appellant claims that Empire could not have effectively canceled Eroglu's policy because Empire did not comply with49 C.F.R. §§ 387.413 and 387.15. Appellant specifically refers this Court to the language in subsection d of 49 C.F.R. § 387.413, which provides, "[c]ancellation. * * * certificates of insurance * * * and other securities and agreements shall not be cancelled or withdrawn until 30 days after the FMCSA receives written notice from the insurance company[.]"
 {¶ 51} Appellant urges on appeal that Eroglu's coverage from Empire was in full force at the time of the accident because Empire failed to send notice of the cancellation to the FMCSA. However, Appellant fails to explain or establish how or why Empire was required to notify the FMCSA of the cancellation. Appellant simply asserts that since Eroglu was hauling trash in interstate commerce he must be subject to the federal regulations, and Empire, as his insurer, was bound to comply with the interstate regulations on Eroglu's behalf.
 {¶ 52} However, a thorough review of the Empire policy of insurance at issue reveals that it does not contain the MCS 90 Endorsement. In addition, the Empire COMMERCIAL AUTO COVERAGE PART TRUCKERS DECLARATIONS does not identify or include Endorsement MCS 90 in its list of forms and endorsements applying to Eroglu's policy of insurance.
 {¶ 53} In addition, the affidavit of Jacqueline Yohe provides that she was an Empire employee and, "through her position" had knowledge of the facts in her affidavit. Specifically, Yohe stated,
 {¶ 54} "5. During the relevant time period, H E Trucking did not have a carrier number issued by the Federal Motor Carrier Safety Administration (`FMCSA') granting it authority to operate as a motor carrier for interstate commerce.
 {¶ 55} "6. The Empire Fire Marine insurance policy was not issued to satisfy the financial responsibility requirements of motor carriers engaged in operating motor vehicles transporting property in interstate commerce." (Supplemental Affidavit of Jacqueline L. Yohe.)
 {¶ 56} Thereafter, the trial court granted Empire summary judgment as a matter of law. (Feb. 10, 2005, Judgment Entry.)
 {¶ 57} Prior to Empire's motion for reconsideration, however, Appellant questioned whether Yohe had direct personal knowledge of whether H E Trucking had FMCSA authority for interstate operation. (Nov. 22, 2004, Plaintiff's Brief in Response.) He makes this same argument on appeal.
 {¶ 58} As Appellant argues, it appears that Yohe has no personal knowledge as to whether Eroglu dba H E Trucking was subject to the foregoing federal requirements based on his daily trucking activities. Eroglu may very well have regularly transported loads in interstate commerce requiring him to comply with the FMCSA requirements. However, the fact that Eroglu transported waste in interstate commerce and should have been subject to the federal regulations does not mean that he actually complied with the applicable federal regulations.
 {¶ 59} Moreover, Appellant fails to explain on what basis Empire should be held responsible for Eroglu's alleged noncompliance since, as Yohe explains, Empire did not issue FMCSA coverage. There is nothing in the record to indicate that Empire had actual or constructive knowledge of Eroglu's daily business pursuits other than what Eroglu might have disclosed when purchasing the policy.
 {¶ 60} Yohe, as an Empire employee, states that through her position with Empire she knew that Empire did not issue Eroglu's policy to satisfy the FMCSA requirements. She also stated that to her knowledge Eroglu did not have an FMCSA carrier number. Thus, Empire was unaware of Eroglu's interstate hauling. There is no evidence to the contrary.
 {¶ 61} Despite this, Appellant argues that the Empire policy contains several references to the use of the tractor trailer out of state. Thus, Appellant claims that the policy language does not support Yohe's statement that Empire did not provide interstate coverage. (Nov. 22, 2004, Plaintiff's Brief in Response.)
 {¶ 62} Contrary to Appellant's argument, the interstate reference that Appellant relies on does not include the specific insurance limits required for motor carriers hauling property in interstate commerce. In fact, the section to which Appellant refers excludes the claimed coverage and does not implicate the federal regulations:
 {¶ 63} "2. Coverage Extensions
 {¶ 64} "* * *
 {¶ 65} "b. Out-Of-State Extensions
 {¶ 66} "While a covered `auto' is away from the state where it is licensed we will:
 {¶ 67} "(1) Increase the Limit of Insurance for Liability Coverage to meet the limit specified by a compulsory or financial responsibility law of the jurisdiction where the covered `auto' is being used. Thisextension does not apply to the limit or limits specified by any lawgoverning motor carriers of passengers or property.
 {¶ 68} "(2) Provide the minimum amounts and types of other coverages, such as no-fault, required of out-of-state vehicles by the jurisdiction where the covered `auto' is being used." (Emphasis added.) (Empire Policy, pg 3 of 12.)
 {¶ 69} Accordingly, the evidence before the trial court establishes that Empire did not issue its policy to Eroglu dba H E Trucking with the MCS 90 Endorsement and it did not issue the policy to satisfy the interstate financial responsibility requirements. Further, Appellant fails to direct this Court's attention to anything tending to indicate that Empire, as Eroglu's insurer, had an obligation to determine if its insured was hauling in interstate commerce and then issue the requisite coverage. Thus, based on the type of insurance provided to Eroglu, the policy was properly canceled for lack of payment.
 {¶ 70} Based on the foregoing, the award of summary judgment in Empire's favor is affirmed, and Appellant's first assignment of error is overruled.
 {¶ 71} Appellant's second assignment of error concerns Trinity. In this assignment, Appellant claims:
 {¶ 72} "THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO PLAINTIFF/APPELLANT WHEN IT SUSTAINED THE MOTION FOR SUMMARY JUDGMENT OF TRINITY TRANSPORTATION COMPANY AND FOUND THAT IT WAS ENTITLED TO JUDGMENT IN ITS FAVOR AS A MATTER OF LAW."
 {¶ 73} Appellant argues that Eroglu was acting as Trinity's agent on the day of the accident and that Trinity constructively controlled the vehicle operated by Eroglu. As such, Appellant argues that Trinity should be responsible for Eroglu's actions, including those that resulted in the motor vehicle accident causing Appellant's injuries. In his response to Appellee's motion for summary judgment, Appellant for the first time directed the trial court's attention to federal law and argued that Trinity is responsible for Eroglu's actions. Specifically, Appellant cites 49 U.S.C.A. § 14102 and 49 C.F.R § 376.12 et seq. in support of his claim that Trinity assumed control and responsibility for its shipments placed in another driver's possession in interstate commerce. However, Appellant did not present any caselaw or evidence in support of this claim. Appellee presented undisputed evidence establishing that it was not liable pursuant to Ohio law.
 {¶ 74} On appeal, Appellant argues that Trinity failed to establish that the Department of Transportation, Federal Motor Carrier Safety Administration Regulations did not apply. Thus, Appellant claims that the FMCSA regulations require Trinity to remain responsible for its load transported in interstate commerce. However, Appellant's arguments on appeal lack merit since he failed to come forth with any evidence tending to create a genuine issue of material fact for trial.
 {¶ 75} 49 U.S.C.A. § 14102 entitled leased motor vehicles provides in part,
 {¶ 76} "(a) General authority of Secretary.— The Secretary may require a motor carrier providing transportation subject to jurisdiction under subchapter I of chapter 135 that uses motor vehicles not owned by it to transport property under an arrangement with another party to.
 {¶ 77} "(1) make the arrangement in writing signed by the parties specifying its duration and the compensation to be paid by the motor carrier;
 {¶ 78} "(2) carry a copy of the arrangement in each motor vehicle to which it applies during the period the arrangement is in effect;
 {¶ 79} "(3) inspect the motor vehicles and obtain liability and cargo insurance on them; and
 {¶ 80} "(4) have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier."
 {¶ 81} Title 49 C.F.R. § 376.1, applicability, provides:
 {¶ 82} "The regulations in this part apply to the following actionsby motor carriers registered with the Secretary to transport property:
 {¶ 83} "(a) The leasing of equipment with which to perform transportation regulated by the Secretary.
 {¶ 84} "(b) The leasing of equipment to motor private carrier or shippers.
 {¶ 85} "(c) The interchange of equipment between motor common carriers in the performance of transportation regulated by the Secretary." (Emphasis added.)
 {¶ 86} Title 49 C.F.R. § 376.2 is the definitions section for Part 376, the lease and interchange of vehicles. It provides the following definitions:
 {¶ 87} "(a) Authorized carrier. A person or persons authorized to engage in the transportation of property as a motor carrier under the provisions of 49 U.S.C. 13901 and 13902.
 {¶ 88} "(b) Equipment. A motor vehicle, straight truck, tractor, semitrailer, full trailer, any combination of these and any other type of equipment used by authorized carriers in the transportation of property for hire.
 {¶ 89} "* * *
 {¶ 90} "(e) Lease. A contract or arrangement in which the owner grants the use of equipment, with or without driver, for a specified periodto an authorized carrier for use in the regulated transportation of property, in exchange for compensation.
 {¶ 91} "(f) Lessor. In a lease, the party granting the use of equipment, with or without driver, to another.
 {¶ 92} "(g) Lessee. In a lease, the party acquiring the use of equipment with or without driver, from another.
 {¶ 93} "* * *
 {¶ 94} "(j) Private carrier. A person, other than a motor carrier, transporting property by motor vehicle in interstate, or foreign commerce when (1) the person is the owner, lessee, or bailee of the property being transported; and (2) the property is being transported for sale, lease, rent, or bailment, or to further a commercial enterprise." (Emphasis added.)
 {¶ 95} 49 C.F.R. § 376.11 provides the general leasing regulations which state:
 {¶ 96} "Other than through the interchange of equipment as set forth in § 376.31, and under the exemptions set forth in Subpart C of these regulations, the authorized carrier may perform authorizedtransportation in equipment it does not own only under the followingconditions:
 {¶ 97} "(a) Lease. There shall be a written lease granting the use of the equipment and meeting the requirements contained in § 376.12.
 {¶ 98} "(b) Receipts for equipment. Receipts, specifically identifying the equipment to be leased and stating the date and time of day possession is transferred, shall be given as follows:
 {¶ 99} "(1) When possession of the equipment is taken by the authorized carrier, it shall give the owner of the equipment a receipt. * * *
 {¶ 100} "* * *
 {¶ 101} "(c) Identification of equipment. The authorized carrieracquiring the use of equipment under this section shall identify theequipment as being in its service as follows:
 {¶ 102} "(1) During the period of the lease, the carrier shall identify the equipment in accordance with the FMCSA's requirements in49 CFR part 390 of this chapter (Identification of Vehicles) [requiring in part the display of the motor carrier identification number and trade name 49 C.F.R. § 390.21(b)(1), (2)].
 {¶ 103} "(2) Unless a copy of the lease is carried on the equipment, the authorized carrier shall keep a statement with the equipment during the period of the lease certifying that the equipment is being operated by it. * * *" (Emphasis added.)
 {¶ 104} Finally, Appellant directs this Court's attention to49 C.F.R. § 376.12, entitled written lease agreements, which states in part:
 {¶ 105} "Except as provided in the exemptions set forth in subpart C of this part, the written lease required under Sec. 376.11(a) shall contain the following provisions. The required lease provisions shall be adhered to and performed by the authorized carrier.
 {¶ 106} "(a) Parties. The lease shall be made between the authorized carrier and the owner of the equipment. * * *
 {¶ 107} "* * *
 {¶ 108} "(c) Exclusive possession and responsibilities. (1) The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrierlessee shall assume complete responsibility for the operation of theequipment for the duration of the lease.
 {¶ 109} "* * *
 {¶ 110} "(4) Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements." (Emphasis added.)
 {¶ 111} The Ohio Supreme Court has addressed these regulations inWyckoff Trucking, Inc. v. Marsh Brothers Trucking Service, Inc. (1991),58 Ohio St.3d 261, 569 N.E.2d 1049, and held that,
 {¶ 112} "In tort causes of action involving leased vehicles of interstate motor carriers, primary liability shall be determined with regard to Interstate Commerce Commission regulations rather than the common-law doctrines of respondeat superior, master-servant, independent contractor and the like." Id. at paragraph one of the syllabus.
 {¶ 113} Thus, the federal regulations create a statutory presumption of a master-servant relationship between the motor carrier and the driver. Surprisingly, however, neither party has addressed theWyckoff decision in their briefs on appeal. In fact, Appellant fails to direct this Court's attention to any caselaw or evidence in support of his argument.
 {¶ 114} Notwithstanding, paragraph two of the Wyckoff syllabus held that,
 {¶ 115} "In order for liability to attach on an interstate carrier-lessee under Interstate Commerce Commission regulations, itmust be established that, at the time the cause of action arose, (1) a lease of the vehicle was in effect and (2) the vehicle displayed the carrier-lessee's placard listing its I.C.C. numbers". (Emphasis added.)
 {¶ 116} Finally, the Wyckoff Court held in paragraph three of the syllabus:
 {¶ 117} "Section 1057.12(c)(1), Title 49, C.F.R. creates an irrebuttable presumption of an employment relationship between the carrier-lessee and the driver of a vehicle that displays the I.C.C. identification numbers of the carrier-lessee."
 {¶ 118} In Wyckoff, Bell was operating a tractor-trailer owned by his employer Wyckoff when he was involved in a motor vehicle accident. The truck was subject to a written lease agreement between Wyckoff and Rogers Trucking Co. under which Rogers had exclusive control and responsibility for the truck. However, Wyckoff and Rogers also had a verbal agreement allowing Wyckoff to enter into side agreements to haul loads for others when the truck was not needed by Rogers.Wyckoff at 262.
 {¶ 119} On the date of the accident, Bell was on route to pick up a load for another company pursuant to a side agreement when his truck struck another vehicle. At the time of the accident, Bell's truck was subject to the Rogers' lease agreement and it was displaying a placard identifying Rogers' I.C.C. number. Id. As the syllabus indicates, the Ohio Supreme Court determined that Rogers was primarily responsible for the injuries and damages sustained based on the lease agreement and the display of Rogers' I.C.C. number. It explained that the federal regulations applied to every such lease entered into by an I.C.C.-licensed carrier requiring it to assume complete responsibility for the operation of the vehicle, "even if the driver embarks on an undertaking of his or her own while using the carrier-lessee's I.C.C. authority". Id. at 265. Thus, it found that pursuant to the federal regulations, Bell was irrebuttably presumed to be Rogers' employee.
 {¶ 120} In Cincinnati Ins. Co. v. Haack (1997), 125 Ohio App.3d 183,708 N.E.2d 214, the Second District Court of Appeals analyzed and explained Wyckoff stating, "when a lessee motor carrier's I.C.C. or P.U.C.O. [Ohio] placard is in the window of the truck at the time of the accident, the driver and truck are presumed to be under the employment of the lessee motor carrier and presumed to have been acting `in the service of' the motor carrier at the time of the accident." Id. at 197.
 {¶ 121} In Bookwalter v. Prescott, 6th Dist. No. L-05-1015,2006-Ohio-585, the Sixth District Court of Appeals addressed the Ohio Supreme Court's Wyckoff decision and found that it was factually inapplicable because Bookwalter did not involve a written lease. Id. at 3. Bookwalter relied solely on the fact that there was no written lease agreement between Prescott and the companies. However, Wyckoff does not explicitly require that the lease be written.
 {¶ 122} In Canal Ins. Co. v. Brogan (1994), 93 Ohio App.3d 765,639 N.E.2d 1219, Brogan was an independent owner and operator of a tractor-trailer who had a written lease agreement with Tri-State Expedited Services, Inc., a company that retained independent contractors to provide trucking services for other companies. While on a return trip with an empty trailer, Brogan was in an accident. At the time of the accident, Brogan's truck was displaying Tri-State's placard and its I.C.C. numbers. Id. at 767. However, Tri-State argued that Brogan was not engaged in its business at the time of the collision since he had already made the delivery and was on his way home.
 {¶ 123} The Tenth District Court of Appeals disagreed and found thatWyckoff applied and imposed liability since Brogan was displaying Tri-State's placard at the time of the accident and a lease was in effect. Id. at 771-772. The court noted that, "Wyckoff suggests that the more crucial issue is not whether the lessor should have removed the I.C.C. placard, but whether, at the time the cause of action arose, a lease was in effect and the lessor was a statutory employee." Id. at 771.
 {¶ 124} Canal Ins. Co. is particularly interesting since it reflects that a transportation broker, such as MJ Transport in the instant matter, can also be the authorized interstate motor carrier subject to the federal lease requirements.
 {¶ 125} Based on all of the foregoing, in order for Appellant to establish liability based on the federal regulations andWyckoff, it must first be determined that Trinity was an authorized motor carrier registered with the Secretary of the Department of Transportation at the time of this accident. However, there is no evidence on this issue at all.
 {¶ 126} Contrary to Appellant's assertions, the affidavit of DiMatteo merely indicates that Trinity is a trucking company that hauls recyclables from Long Island, New York to various locations, including Ohio. It contains no indication as to whether it was an authorized interstate carrier.
 {¶ 127} DiMatteo's affidavit further provides that Trinity retained Eroglu's service through a third-party broker and that Trinity had no direct arrangement or contact with Eroglu. Thus, there was apparently no written lease agreement or any other agreement between Eroglu and Trinity in the instant matter. Again, however, there is no evidence as to Trinity's arrangements with its third-party broker or whether there is some written agreement with this broker.
 {¶ 128} Further, neither we nor the trial court can determine from the record whether an I.C.C. number was displayed on Eroglu's vehicle, or whose number it might have been. There is no mention in any evidentiary matter as to whose I.C.C. number, if any, was displayed on Eroglu's tractor-trailer at the time of the accident with Appellant, whether Eroglu was required to display such a number or who was responsible for ensuring that he did, if this was a requirement.
 {¶ 129} It is also important to note that the trial court's record reveals that Appellant likely did very little discovery regarding Trinity. The record contains no discovery notices by Appellant directed to Trinity. Further, although Appellant was granted leave to depose Trinity's agent, DiMatteo, it is unclear whether this deposition ever took place.
 {¶ 130} The only evidence reveals that Trinity retained Eroglu's services through a third-party broker, MJ Transport. There is nothing before the trial court or this Court showing whether MJ Transport was an authorized interstate motor carrier as was Tri-State in Canal Ins.Co., supra. Accordingly, Eroglu's broker and not Trinity may have been the authorized interstate motor carrier. Appellant further fails to set forth anything evidencing a lease agreement between Eroglu and MJ Transport. There is likewise no evidence as to whose I.C.C. number, if any, was displayed on Eroglu's truck. While we can presume that someone must be ultimately responsible for the interstate transit of this load based on the federal regulations, it is altogether unclear based on the record before us just who that responsible party may be.
 {¶ 131} Again, a plaintiff cannot rely on mere allegations, but must set forth specific facts showing a genuine issue for trial. Jackson v.Alert Fire Safety Equip., Inc. (1991), 58 Ohio St.3d 48, 52,567 N.E.2d 1027. Civ. R. 56(E) states in part, "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party."
 {¶ 132} Accordingly, since Appellant failed to present any evidence even tending to establish that these regulations apply, we must overrule Appellant's arguments based on the foregoing federal regulations. Civ. R. 56(E). Appellant's claims also fail pursuant to Ohio law.
 {¶ 133} Under Ohio law, an agency relationship is generally a contractual relationship created by an agreement between the parties.Johnson v. Tansky Sawmill Toyota, Inc. (1994), 95 Ohio App.3d 164,642 N.E.2d 9. Where the evidence is not in conflict, the question of whether a person is an employee or an independent contractor is a matter of law to be decided by the court. Schickling v. Post Publishing Co. (1927),115 Ohio St. 589, 155 N.E. 143, syllabus; Bostic v. Connor (1988),37 Ohio St.3d 144, 146-147, 524 N.E.2d 881. An employer is not usually responsible for the negligent acts of its independent contractors in Ohio. Knickerbocker Bldg., Inc. v. Phillips (1984), 20 Ohio App.3d 158,485 N.E.2d 260, paragraph one of the syllabus.
 {¶ 134} The primary test of whether a person is the agent of another is whether the principal has the right of control of the other. Funk v.Hancock (1985), 26 Ohio App.3d 107, 110, 498 N.E.2d 490, citingHaluka v. Baker (1941), 66 Ohio App. 308, 312, 34 N.E.2d 68. The determination of who has the right to control must be made by examining the individual facts of each case. To determine control, factors to be considered include: the details of the work; the hours worked; the tools employed; the route traveled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts. Gillum v. Indus. Comm. (1943), 141 Ohio St. 373, 380-382,48 N.E.2d 234.
 {¶ 135} The Ohio Supreme Court in Gillum stated, "if the manner ormeans of doing the work or job is left to one who is responsible to theemployer only for the result, an independent contractor relationship isthereby created." (Emphasis added.) Id. at paragraph two of the syllabus.
 {¶ 136} Patricia DiMatteo, the Secretary Treasurer for Trinity, explained in her affidavit that Trinity had a contract to haul recyclables from Long Island, New York to Poland, Ohio. Trinity is occasionally unable to fulfill its hauling obligations on its own. Thus, Trinity uses MJ Transport, a brokerage company, to retain a truck and driver. On the date in question, Trinity contacted MJ Transport, and MJ Transport obtained Eroglu to haul Trinity's load from New York to a BFI landfill in Ohio. Trinity had no involvement with the selection of Eroglu or H E Trucking or with the manner in which the load was transported to the landfill in Ohio. (Affidavit of Patricia DiMatteo.)
 {¶ 137} DiMatteo's affidavit is undisputed. Thus, Trinity presented undisputed evidence that it never employed Eroglu and that Trinity has never directly contracted with Eroglu's company for hauling services.
 {¶ 138} However, Appellant claims that the trip manifest shows that Eroglu's customer was Trinity and that he was acting as its agent at the time of the accident. According to DiMatteo, the trip manifest was the only document generated relevant to this shipment, which was designed to track the shipment. (Affidavit of Patricia DiMatteo, ¶ 8.)
 {¶ 139} The manifest identifies Trinity as the "Generator," and above a signature line labeled "Driver" appears to be the name "Hasan." The manifest does not specifically reference Eroglu or H E Trucking nor does it identify the relationship between Trinity and Eroglu. It does state in part,
 {¶ 140} "THIS MANIFEST IS FOR REFERENCE PURPOSES ONLY. GENERATOR DOES NOT TAKE POSSESSION OR TITLE OF ANY CARGO OR MATERIALS BEING SHIPPED AND DOES NOT ASSUME ANY LIABILITY ASSOCIATED WITH THE SHIPMENT OF SUCH MATERIALS."
 {¶ 141} Thus, as Appellant claims, the manifest appears to indicate Eroglu was operating on Trinity's behalf. However, it does not establish that Trinity controlled Eroglu's actions.
 {¶ 142} Appellant also argues that a receipt issued by BFI on March 22, 2000, establishes Eroglu's agency relationship with Trinity. Although this receipt identifies Trinity as the customer and it includes what appears to be Hasan Eroglu's signature, it in no way establishes the nature of the relationship between Eroglu and Trinity as employer and employee.
 {¶ 143} Contrary to Appellant's arguments, Trinity presented undisputed evidence that it never employed Eroglu. It also established that Trinity has never directly contracted with Eroglu's company for hauling services. (Affidavit of Patricia DiMatteo.) DiMatteo likewise explained that Trinity had no involvement with the selection of Eroglu or H E Trucking or with the manner in which the load was transported to the landfill in Ohio. (Affidavit of Patricia DiMatteo.)
 {¶ 144} Appellant claims that the trip manifest shows that Eroglu's customer was Trinity. Appellant also argues that the BFI receipt establishes Eroglu's agency relationship. These documents do not, however, establish that Trinity controlled the manner or means of Eroglu's performance. Under Ohio law, the fact that Eroglu was delivering recyclables on Trinity's behalf is insufficient to establish an agency relationship.
 {¶ 145} Appellant also claims that Trinity directed the means and the manner in the way that Eroglu delivered this load to Mahoning County, Ohio, since Trinity chose the date and time the load was to be picked up and delivered, as well as the place that the load was to be picked up and delivered. Further, Appellant claims that there was only one logical direct route between the pick up and delivery locations. However, there is no evidentiary material supporting these claims.
 {¶ 146} Further, the fact that Eroglu was allegedly on the only road that would enable him to deliver the load in question does not establish that Trinity controlled Eroglu's route from New York to Ohio. Appellant presents absolutely no evidence even tending to show that Trinity had the right to control the manner in which Eroglu worked.
 {¶ 147} Appellant also attached another BFI receipt dated March 20, 2000, as Plaintiff's Exhibit C, to establish that this was not the first time that Eroglu transported a load on Trinity's behalf. Appellant argues that this shows the nature of Empire and Eroglu's relationship as ongoing. However, the fact that their relationship involved more than one shipment does not establish that Trinity directed the means and the manner by which Eroglu delivered this load.
 {¶ 148} Based on the foregoing, summary judgment was appropriate in this case pursuant to Ohio law since Eroglu was acting as Trinity's independent contractor at the time of the accident.
 {¶ 149} In conclusion, Appellant's assignments of error lack merit and are overruled. Summary judgment is affirmed in both Empire and Trinity's favor.
Vukovich, J., concurs.
DeGenaro, J., concurs.